UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

<u>For Online Publication Only</u>

----------------------------------------------------------------X

CATHERINE COX,

                    Plaintiff,

**<u>MEMORANDUM AND
ORDER</u>**

    -against-

11–CV–5980 (JMA)

KEVIN P. McKERNAN, ESQ., PATRICK C.,
GATINS, ESQ. and MCKERNAN & GATINS,

                  Defendants.

----------------------------------------------------------------X

A P P E A R A N C E S :

Michael Alan Freeman
Greenberg Freeman LLP
110 E. 59 St., Fl. 22
New York, NY  10022
      *Attorneys for Plaintiff*

John M. Dalton, Esq.
Law Firm of John M. Dalton
406 Forest Ave.
Staten Island, NY  10301
      *Attorney for Defendant Kevin P. McKernan, Esq.*

Patrick C. Gatins, Esq.
27 Jaffe St.
Staten Island, NY  10314
      *Defendant Pro Se*

Kevin P. McKernan, Esq.
Law Firm of Kevin P. McKernan
7247 Amboy Rd.
Staten Island, NY  10307
      *Attorney for Defendant McKernan & Gatins*

**AZRACK**, **United States Magistrate Judge:**

      On July 11, 2012, the parties in this action consented to my conducting all proceedings in

this case, including trial and entry of final judgment.  ECF Nos. 24–25.  Now before me is

plaintiff Catherine Cox's motion for summary judgment against defendants Kevin McKernan, Esq.; McKernan & Gatins ("M&G"; together with McKernan, "Opposing Defendants"); and Patrick C. Gatins, Esq., (collectively with Opposing Defendants, "defendants") as to defendants' liability for legal malpractice.

For the reasons set forth below, plaintiff's motion is granted in part and denied in part.

## I.      BACKGROUND

### A.  Plaintiff's Injury

From approximately September 1992 until June 1994, plaintiff was a health and physical education teacher, and the coach of the boys' tennis team, at Port Richmond High School in Staten Island (the "School").  Pl. Decl. Supp. Mot. Summ. J. ("Pl. Decl.") ¶ 4, ECF No. 34; Pl. Dep. 6:2–3, 1/10/13, McKernan's Mem. of L. Opp'n Mot. Summ. J. ("Opp'n Br.") Ex. H, ECF No. 37; Pl.'s Sworn Examination Before Trial ("Pl. EBT") at 2, 9/13/93, Opp'n Br. Ex. A. Plaintiff played college basketball at SUNY Cortland beginning in 1974, coached girls' junior varsity basketball at St. Joseph's By the Sea High School from 1980 to 1982, and taught sports including basketball at the School.  Pl. Dep. 6:14–8:23.  Before beginning her job at the School, plaintiff worked for approximately a decade in other locations as a physical education teacher. Pl. EBT at 2.

On March 12, 1993, plaintiff participated in an after-school charity basketball game (the "Game") in the School's boys' gymnasium (the "Gym").  Pl. Decl. ¶ 5; Pl. EBT at 3; Pl. Dep. 12:25–13:5.  Plaintiff's friend Karen Lynch, who taught at the School, asked plaintiff to participate in the Game.  Pl. Dep. 13:11–23.  The Game was not a Board of Education ("Board") function, and plaintiff's participation in the Game was entirely voluntary.  Id. 13:17–19; 20:24–21:3; Pl. Decl. ¶ 6.

While playing in the Game, plaintiff slipped in the center of the court and fell to the floor. Pl. Decl. ¶ 7; Pl. EBT at 4.  Lynch witnessed plaintiff's fall.  Decl. of Karen Lynch ("Lynch Decl.") ¶¶ 2–4, Pl.'s Mem. Supp. Mot. Summ. J. ("Pl. Br.") Ex. 5, ECF No. 35.  Frank Guglielmo, who taught at the School and coached the boys' varsity basketball team during the 1992–1993 season, also participated in the Game.  Decl. of Frank Guglielmo ("Guglielmo Decl.") ¶¶ 1, 4, Pl. Br. Ex. 6.  When plaintiff fell, she was heading toward the opposite end of the court to play defense.  Pl. EBT at 4; Pl. Dep. 23:3–15; Lynch Decl. ¶ 4 ("During the play on which she fell, [plaintiff] appeared to be engaged in the type of ordinary defensive move that I routinely see basketball players make during the course of a game."); Guglielmo Decl. ¶ 4 ("[Plaintiff] . . . slipped and fell while back-pedaling on defense.").  Plaintiff did not observe any visible obstacle or condition on the floor that caused her to fall.  Pl. Decl. ¶ 8; Pl. Dep. 23:24–24:7.

The Gym had been renovated in the Fall of 1992.  Pl. EBT at 13; see also Guglielmo Decl. ¶ 2.  After the renovation, the Gym floor was slippery, Guglielmo Decl. ¶ 3; Pl. EBT at 13, though the cause and extent of the slipperiness are unclear.

With regard to what caused the floor's slipperiness, plaintiff testified in 1993 that "the company that did the floor didn't do it right and there was nothing that could be done about it." Pl. EBT at 13.[1]  Plaintiff also testified in 1993 that after the renovation, "[t]he whole entire floor was extremely dusty and slippery."  Id. (emphasis added).  In 2013, plaintiff testified that Guglielmo told her the floor was "very, very slippery from a certain wax that they had put on." Pl. Dep. 24:16–25; see also id. 25:16–18.  Guglielmo states that the Gym floor "had a tendency to get slippery toward the end of the day," but Guglielmo does not state why.  Guglielmo Decl. ¶

---

[1]  Plaintiff gave this testimony in connection with a personal injury suit she brought against the City in state court (the "Underlying Action"); see infra Part I(B)).

3.  Guglielmo also recalls that the School's maintenance staff "tried" to address the problem of the slippery floor prior to the Game, but he does not state what, if anything, the maintenance staff did or what he believes the maintenance staff should have done.  Id. ¶ 8.

With regard to the extent of the floor's slipperiness, plaintiff testified that the floor was "so slippery" that "the kids were always slipping all over the place," such that the basketball coaches "had to use water and a mop just to . . . dry certain areas."  Pl. EBT at 13.  Plaintiff also testified that after the renovation, the basketball coaches, who she sometimes helped, would put water on the Gym floor "to try to make it less slippery, but the water would dry and it would be [slippery again;  in] 10, 15 minutes it would be back to the way it was."  Id.  Guglielmo recalls "numerous occasions" before the Game when members of the School's boys' basketball team, as well as members of opposing teams, "would slip and fall due to the condition of the floor in the same area where [plaintiff] fell."  Guglielmo Decl. ¶ 7.  The record, however, contains no specific evidence about when, or how often, people besides plaintiff slipped on the Gym floor.

Plaintiff gave contradictory testimony about whether she knew, before the Game, about problems with the Gym floor.  At her 1993 deposition, plaintiff testified that (1) she was aware, before the Game, that there had been problems with the floor; (2) she and all the physical education teachers complained about the floor to administrators in charge of their department; (3) members of the boys' basketball team "were constantly complaining to [her] about the gym floor"; and (4) although she had never played a basketball game in the Gym or run up and down the Gym floor before the Game, she would "stand there and take a few shots" with a basketball when her students were practicing.  Pl. EBT at 12–13.  In contrast, in the declaration she made twenty years later in support of the instant motion, plaintiff states that "I learned after the Accident that there was a problem with the floor that caused other people to slip and fall, but I

4

was not aware of that condition before the Game." Pl. Decl. ¶ 9. Similarly, plaintiff testified at her deposition for the instant action that she was not aware, before the Game, of anyone complaining to any party responsible for the Gym's floor. Pl. Dep. 37:23–38:5.

Because of the accident, plaintiff suffered a fracture of the radius (a bone of the forearm), which caused her steady wrist pain and discomfort. Pl. Decl. ¶¶ 10–11.

Plaintiff initially went to a hospital emergency room and, on March 15, 1993, began treatment for her arm with Dr. John Hurley. Pl. EBT at 5–7; Pl. Dep. 28:2–13.

For months following the accident, plaintiff was unable to participate in sports or engage in other physical activities. Pl. Decl. ¶ 12. Plaintiff also developed carpal tunnel syndrome as a result of the accident. Pl.'s R. 56.1 Stmt. ("Pl. 56.1") ¶ 12, ECF No. 35. To this day, plaintiff has limited motion and constant numbness in her wrist and cannot engage in many physical activities to the same extent she could before the accident. Pl. Decl. ¶¶ 13–14.

Plaintiff testified that she did not apply for workers' compensation. Pl. Dep. 36:22–24; 37:12–13. Disputing this testimony, Opposing Defendants submit a Patient History Report, purportedly from "McBride & Hurley, M.D.," which states that the School's workers' compensation account paid for treatment of a patient named "Catherine" for a distal radial fracture between March 15, 1993 and May 25, 1993—dates which coincide with plaintiff's injury and her testimony that she began treatment with Dr. John Hurley on March 15, 1993. Patient History Rept., Opp'n Br. Ex. I; see Pl. EBT at 6.

### B.   The Underlying Action

After the accident, plaintiff consulted with Attorney Paul F. Scano about bringing a lawsuit to recover damages for her injury. Pl. Decl. ¶ 15. On May 14, 1993, Scano filed a Notice of Claim on plaintiff's behalf against both the City of New York (the "City") and the

Board (which is now the Department of Education).  Notice of Claim, Pl. Br. Ex. 8.  After filing the Notice of Claim, Scano did not file a complaint on plaintiff's behalf.  Pl. Decl. ¶ 16.

Plaintiff and Scano terminated their relationship by mutual consent during the first half of 1994.  Id. ¶ 17.

On approximately June 3, 1994, plaintiff met McKernan to discuss bringing a personal injury action to recover damages for the injuries she sustained at the Game.  Id. ¶ 18.  The record contains contradictory evidence concerning whether Gatins was also present at this meeting.  Compare id. with Pl. Dep. 34:4–13.  McKernan and Gatins were partners in M&G, a New York general partnership, from approximately October 1990 until sometime in 2008.  Pl's 56.1 ¶ 27.  Plaintiff came to M&G because McKernan had a relationship with her parents.  McKernan Affm. Opp'n Mot. Summ. J. ("McKernan Affm.") ¶ 7, Opp'n Br. Ex. B; Pl. Dep. 34:8 ("[McKernan] was [plaintiff's] father's attorney.").

Plaintiff signed a written retainer agreement by which she agreed to have defendants represent her in a lawsuit arising from her accident.  Pl. 56.1 ¶ 30; McKernan's R. 56.1 Stmt. ("Opposing Defs. 56.1) ¶ 30, ECF No. 37; Pl. Decl. ¶ 20.  In a letter dated June 18, 1994, McKernan sent plaintiff a letter confirming "that you have retained me [McKernan] to recover for personal injuries you sustained as a result of the accident."  June 18, 1994 Ltr., Pl. Br. Ex. 10.  McKernan enclosed an unsigned retainer agreement, dated June 3, 1994, which states that plaintiff "hereby retains [M&G] to serve as attorney of record to represent . . . [plaintiff] for personal injuries . . . sustained by [plaintiff] as a result of an accident which occurred on the 12th day of March, 1993 due to the negligence of [the] New York City Board of Education, and/or others."  Retainer Agr., Pl. Br. Ex. 10; see also Pl. Dep. 32:23–25 (plaintiff testifying that she retained M&G).  M&G filed a Retainer Statement with the New York State Office of Court

Administration.  Retainer Stmt., Pl. Br. Ex. 11.  Opposing Defendants concede that plaintiff and defendants formed an attorney-client relationship.  Pl. 56.1 ¶ 32; Opposing Defs. 56.1 ¶ 32.

By what appears to be an unsigned summons from M&G dated June 3, 1994, and a verified complaint purportedly signed by McKernan on behalf of M&G, defendants commenced a personal injury suit against the City, but not against the Board, on plaintiff's behalf. Underlying Action Summons & Verified Compl., Cox v. City, Index No. 11952/94 (N.Y. Sup., Richmond Cty.), Pl. Br. Ex. 12.  On approximately June 29, 1994, the City served an answer. City's Answer, Pl. Br. Ex. 13.

During the first year after plaintiff retained defendants, she met with McKernan "[p]robably five to ten times."  Pl. Dep. 35:7.  Plaintiff and Opposing Defendants agree that from approximately the end of June 1994 until May 2010, all communications plaintiff had with defendants regarding her case were with McKernan.  Pl. 56.1 ¶ 42; Opposing Defs. 56.1 ¶ 42; Pl. Decl. ¶ 21.  Plaintiff and Opposing Defendants also agree that whenever plaintiff asked McKernan about her case, McKernan assured her "that everything was fine."  Pl. 56.1 ¶ 43; Opposing Defs. 56.1 ¶ 43; Pl. Decl. ¶ 22.

Despite these assurances, defendants did not file a Request for Judicial Intervention ("RJI") asking the State Court to hold a preliminary conference until March 12, 2008.  RJI, Pl. Br. Ex. 16.

Why defendants waited from June 1994 until March 2008 to file the RJI is a mystery.

Further, McKernan and Gatins offer conflicting accounts of who was responsible for plaintiff's case.  Gatins states that he has no recollection of ever meeting with plaintiff, doing any legal work on her behalf, or receiving a request from McKernan to perform legal work on plaintiff's behalf.  Aff. of Gatins ("Gatins Aff.") ¶¶ 5–7, Pl. Br. Ex. 9.  In contrast, McKernan

states that between June 1994 and March 2008, "medical records were obtained," and his "understanding from conversation with [Gatins] is that [Gatins] spoke/attempted to speak to various [witnesses or potential witnesses]."  McKernan's Verified Am. Resp. to Pl.'s First Set of Interrogatories ("McKernan Resp. to Interrogs.") ¶¶ 2–6, Pl. Br. Ex. 15.  McKernan states that he personally did not have any such conversations but "was informed by [Gatins] that [Gatins] was investigating the claim."  Id. ¶¶ 3, 5.  Similarly, McKernan states that Gatins "was regularly consulted during the pendency of the [plaintiff's] case from the start of the case [and] met with [plaintiff]."  McKernan Affm." ¶ 4.  Accordingly, McKernan "believed erroneously . . . that the matter was being handled appropriately [by Gatins]."  Id.  McKernan states that, in retrospect, he "should have been more involved in the matter" because plaintiff came to McKernan due to his relationship with her parents.  Id. ¶ 7.  However, McKernan states that he "never sought to mislead [plaintiff] as I relayed information received from [Gatins] and what at the time I thought . . . was accurate."  Id. ¶ 5.  Likewise, McKernan states that he "provided the best information I had and believed and never intentionally mislead anyone."  Id. ¶ 9.

McKernan also asserts that although the RJI is purportedly signed by McKernan, it was Gatins who prepared the RJI, signed the RJI in McKernan's name, and wrote "File" on the RJI in his own handwriting.  McKernan Affm. ¶ 6.  Further, McKernan provides evidence that Gatins wrote and signed a check to the Richmond County Clerk to file the RJI.  Check No. 11775, Opp'n Br. Ex. E.  Supporting these claims, Roseanne Damiano, who was formerly a secretary at M&G and is now a secretary at McKernan's office, states that she is familiar with the handwriting of both McKernan and Gatins and confirms that Gatins signed the RJI in McKernan's signature, wrote "File" on the RJI, and signed the check to file the RJI.  Decl. of Roseanne Damiano ("Damiano Decl.") ¶¶ 4–6, Opp'n Br. Ex. C.  Damiano also recalls that

8

Gatins would sometimes prepare documents that either McKernan or Gatins would sign in McKernan's name.  Id. ¶ 7.

On approximately April 1, 2008, the State Court held a preliminary conference.  See Apr. 1, 2008 Ltr., Pl. Br. Ex. 17.  The April 1, 2008 Letter, purportedly written and signed by McKernan, informs plaintiff that defendants will be sending her HIPPA authorizations to sign, and that her deposition has been scheduled for June 19, 2008.  Id.

On May 2, 2008, the City moved to dismiss plaintiff's complaint on the grounds that the complaint failed to state a cause of action because the City was not a proper defendant.  City's Notice of Mot. and Affm. Supp. Mot. to Dism., Pl. Br. Ex. 18.  In a Decision and Order dated November 26, 2008 and entered on December 8, 2008, the Honorable Thomas P. Aliotta granted the City's motion, concluding that when defendants commenced the Underlying Action on plaintiff's behalf, "the law was well established that the City of New York and the New York City Board of Education were separate and distinct jural entities," and "the City is not a proper party."  Dec. 8, 2008 Decision & Order at 2, Pl. Br. Ex. 19.

Plaintiff and Opposing Defendants agree that by the time the State Court issued the Decision and Order, the statute of limitations on plaintiff's claim against the Board had long since expired.  Pl. 56.1 ¶ 50; Opposing Defs. 56.1 ¶ 50.

On May 17, 2010, McKernan sent plaintiff a letter enclosing a copy of another letter from McKernan to plaintiff dated January 16, 2009.  Jan. 16, 2009 & May 17, 2010 Ltrs., Pl. Br. Ex. 20.  While McKernan states that he mailed the January 16, 2009 Letter on January 16, 2009, plaintiff states that she did not receive said letter until shortly after May 17, 2010.  Pl. Decl. ¶ 23.  In any event, McKernan states in the January 16, 2009 Letter that plaintiff's case has been dismissed because "the Court felt the wrong party had been sued," and that although McKernan

has contacted Gatins "to find out why [Gatins] brought suit against the City in this matter, not the Board of Education, . . . [Gatins] has failed to respond." Jan. 16, 2009 Ltr.

Plaintiff asserts that after she received the May 17, 2010 Letter, she attempted on several occasions to retrieve her file from McKernan, but McKernan would not cooperate. Pl. Decl. ¶ 25. Plaintiff maintains that McKernan "[f]inally" gave her the file on October 11, 2011, after her new lawyer contacted him. Id. ¶ 26. McKernan, however, states that plaintiff made only one request for her file, which he provided within two weeks of plaintiff's request, after retrieving the file from storage. McKernan Affm. ¶ 10. Similarly, Damiano recalls that plaintiff "only requested her file once when she came to the office without calling first" and that plaintiff picked up the file, "after [McKernan] retrieved it, within two weeks . . . . I do not recollect [plaintiff] ever telephoning the office to request the file before her visit to the office." Damiano Decl. ¶ 8.

McKernan included in plaintiff's file a letter from himself to plaintiff, dated October 11, 2011, which states incorrectly that Attorney Scano filed the Notice of Claim against the City but not the Board, and that "I [McKernan] filed the Complaint against the City . . . being bound by the Notice of Claim." Oct. 11, 2011 Ltr., Pl. Br. Ex. 21. McKernan admits that he "err[ed] in informing [plaintiff] that the Notice of Claim was against the City only." McKernan Affm. ¶ 8. McKernan asserts, however, that this "was not an attempt to shift blame, but [McKernan] had not examined the file in some time, and [McKernan] misread it when [he] drafted the letter to [plaintiff]." Id.

### C. The Instant Action

On December 7, 2011, plaintiff filed a complaint in this Court against defendants, alleging legal malpractice. ECF No. 1. Plaintiff amended her complaint on January 27, 2012. Am. Compl., ECF No. 6. In response, McKernan filed what appear to be identical amended

10

answers on behalf of himself and M&G, except that McKernan's attorney signed the former and McKernan signed the latter.  ECF Nos. 13–14.  Gatins, representing himself, also filed an answer.  ECF No. 7.

On July 11, 2012, the parties consented to my conducting all proceedings in this case, including trial and entry of final judgment.  On July 26, 2012, I denied McKernan's motion for leave to file a third-party complaint against an insurance company that McKernan alleged had improperly denied him and M&G coverage after plaintiff filed her complaint.  ECF Nos. 18, 26.  On March 20, 2013, plaintiff filed the instant motion, to which the Opposing Defendants filed identical oppositions (but for the signatories).  ECF Nos. 33–39.  Gatins did not file any opposition, but plaintiff annexes an affidavit by Gatins to her motion papers.  Gatins Aff.  Opposing Defendants have not cross-moved for summary judgment.

## II.   DISCUSSION

### A.  Summary Judgment Standard

Summary judgment is "proper only when, construing the evidence in the light most favorable to the non-movant, 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  Doninger v. Niehoff, 642 F.3d 334, 344 (2d Cir. 2011) (quoting Fed. R. Civ. P. 56(a)).  The moving party is entitled to judgment as a matter of law if "the nonmoving party . . . fail[s] to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof."  Id.  The substantive law of the action determines which facts are material, and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Konikoff v. Prudential Ins. Co. of Am., 234 F.3d 92, 97 (2d Cir. 2000) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).   In other words, summary judgment is

11

appropriate only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Donnelly v. Greenburgh Cent. School Dist. No. 7, 691 F.3d 134, 141 (2d Cir. 2012) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). In deciding a summary judgment motion, a court cannot credit a party's "merely speculative or conclusory assertions." DiStiso v. Cook, 691 F.3d 226, 230 (2d Cir. 2012); see also Johnson v. Killian, 680 F.3d 234, 236 (2d Cir. 2012) ("[C]onclusory statements or mere allegations [are] not sufficient to defeat a summary judgment motion.") (quoting Davis v. New York, 316 F.3d 93, 100 (2d Cir. 2002)). One of the primary purposes of the summary judgment rule is "to isolate and dispose of factually unsupported claims." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

The Second Circuit has "long recognized that summary judgment is a drastic device, since its prophylactic function, when exercised, cuts off a party's right to present his case to the jury." Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc., 182 F.3d 157, 160 (2d Cir. 1999) (internal quotation marks and citation omitted).

**B. Plaintiff's Legal Malpractice Claim**

"[T]he Erie doctrine applies, whatever the ground for federal jurisdiction, to any issue or claim which has its source in state law." Achtman v. Kirby, McInerney & Squire, LLP, 464 F.3d 328, 337 n.4 (2d Cir. 2006) (quoting Maternally Yours, Inc. v. Your Maternity Shop, Inc., 234 F.2d 538, 541 n.1 (2d Cir. 1956)). Accordingly, New York malpractice law governs this action. See id. (citation omitted).

To establish a legal malpractice claim under New York law, plaintiff must demonstrate "(1) the existence of an attorney-client relationship, (2) negligence, (3) which is the proximate cause of loss, and (4) actual damages." Lok Prakashan, Ltd. v. Berman, 349 F. App'x. 640, 642

12

(2d Cir. 2009) (citing Achtman, 464 F.3d at 337). "It is settled law in New York that in an action against an attorney for alleged malpractice, the plaintiff must show not only that the defendant was negligent, but also that the plaintiff would have been successful in the underlying action." Garguilo v. Schunk, 395 N.Y.S.2d 751, 752 (N.Y. App. Div. 3d Dep't 1977).

Although Gatins has not filed a brief opposing the instant motion, his affidavit is part of the record. Additionally, given McKernan and Gatins' partnership in M&G, the Court construes the evidence in the light most favorable to all the defendants (including Gatins).

### 1. Attorney-Client Relationship

Plaintiff and Opposing Defendants agree that plaintiff and defendants had an attorney-client relationship, and that plaintiff signed a written retainer agreement by which she agreed to have defendants represent her in a lawsuit arising from the accident. See Pl. 56.1 ¶¶ 30, 32; Opposing Defs. 56.1 ¶¶ 30, 32; Pl. Decl. ¶ 20; Pl. Dep. 32:23–25.

Even if Opposing Defendants did not so concede, the record reflects that (1) McKernan confirmed, in the June 18, 1994 Letter, that plaintiff had retained him, June 18, 1994 Ltr.; (2) plaintiff retained M&G, Pl. Dep. 32:23–25; Retainer Stmt.; and (3) while all communications between plaintiff and defendants concerning her case between approximately June 1994 and May 2010 were with McKernan, Pl. 56.1 ¶ 42; Opposing Defs. 56.1 ¶ 42; Pl. Decl. ¶ 21, Gatins signed a check to the Richmond County Clerk to file the RJI and may have participated in the initial meeting with plaintiff, conducted discovery on plaintiff's behalf, and prepared the RJI. See Check No. 11775; Pl. Decl. ¶ 18; McKernan Affm. ¶ 6; McKernan Resp. to Interrogs. ¶¶ 2–6; Damiano Decl. ¶¶ 4–7.

Accordingly, no genuine issue of material fact exists as to whether plaintiff and defendants had an attorney-client relationship, and the Court grants plaintiff's motion for summary judgment on the first element of her claim for legal malpractice.

### 2. Attorney Negligence

Opposing Defendants do not dispute plaintiff's assertion that they failed to adhere to the standard of reasonable care attorneys owe their clients and, therefore, were negligent.

Moreover, the record reflects that defendants were negligent. First, defendants failed to sue the proper defendant in the Underlying Action, causing the State Court to dismiss the Underlying Action long after the statute of limitations for plaintiff to sue the proper defendant expired. Dec. 8, 2008 Decision & Order; Pl. 56.1 ¶ 50; Opposing Defs. 56.1 ¶ 50. Second, defendants took fourteen years to file the RJI yet do not explain what they did until such time, other than obtaining plaintiff's medical records. See RJI; McKernan Resp. to Interrogs. ¶¶ 2–6. Third, despite defendants' apparent failure to pursue plaintiff's case, McKernan continually assured plaintiff "that everything was fine." Pl. 56.1 ¶ 43; Opposing Defs. 56.1 ¶ 43; Pl. Decl. ¶ 22. Making matters worse, the only explanation any of the defendants provided plaintiff for suing the wrong defendant was a false one. Compare Oct. 11, 2011 Letter (McKernan stating incorrectly that he could not name the Board as a defendant in the Underlying Action because he was "bound by the Notice of Claim"); with Notice of Claim (naming both the City and the Board, contrary to McKernan's representation in the October 11, 2011 Letter); see McKernan Affm. ¶ 8 (McKernan admitting that he "err[ed] in informing [plaintiff] that the Notice of Claim was against the City only").

Accordingly, no genuine issue of material fact exists concerning whether defendants were negligent in representing plaintiff in the Underlying Action, and the Court grants plaintiff summary judgment on the second element of her claim for legal malpractice.

### 3. Proximate Cause of Loss

The parties dispute whether defendants' negligence caused plaintiff loss—that is, whether plaintiff would have prevailed in the Underlying Action if her attorneys had named the Board as a defendant.

For plaintiff to have prevailed in the Underlying Action, she would have needed to prove that "a dangerous or defective condition existed [in the Gym], and that the [Board] either created the condition or had actual or constructive notice of it." Leary v. Leisure Glen Home Owners Ass'n, Inc., 920 N.Y.S.2d 193, 194 (N.Y. App. Div. 2d Dept. 2011) (internal quotation marks and citations omitted) (stating elements of cause of action for negligence).

Opposing Defendants argue that the Board would have prevailed on two affirmative defenses in the Underlying Action. First, Opposing Defendants argue that the Board would have prevailed on the affirmative defense that plaintiff assumed the risk of injury because she "was an experienced basketball player and played and coached many games at various locations," the Gym floor's slippery condition was "open" (rather than hidden), and plaintiff knew that the Gym floor was slippery. Opp'n Br. at 8–10. Second, Opposing Defendants appear to argue that the Board would have prevailed on the affirmative defense that an unspecified provision of New York Workers' Compensation Law (NYWCL) barred the Underlying Action because the School's workers' compensation account paid plaintiff's medical bills. See id. at 11; Patient History Rept.

"[I]t is the burden of the defendant-attorney in a legal malpractice action to prove that affirmative defenses, which were raised in the underlying action and which were not predicated

15

on his own negligence, would have defeated the plaintiff's claim." Romanian Am. Interests, Inc. v. Scher, 464 N.Y.S.2d 821, 824 (N.Y. App. Div. 2d Dep't 1983); see also Nitis v. Goldenthal, 513 N.Y.S.2d 186, 188 (N.Y. App. Div. 2d Dep't 1987) ("'[A]n attorney who asserts that an affirmative defense exists which would defeat the underlying claim bears the burden of proof on that issue.") (citation omitted).

        *i.*      *Assumption of Risk*

Assumption of risk "is really a principle of no duty, or no negligence and so denies the existence of any underlying cause of action." Morgan v. State, 685 N.E.2d 202, 208 (N.Y. 1997) (emphasis in original); see also Turcotte v. Fell, 502 N.E.2d 964, 968 (N.Y. 1986).  Therefore, although New York has adopted comparative negligence principles whereby a plaintiff's contributory negligence does not constitute a complete defense, a defendant in a negligence action can still receive summary judgment where the plaintiff has assumed the risk of a particular activity.  See Scoma v. United States, No. 02–CV–2970, 2004 WL 40511, at *2 (E.D.N.Y. Jan. 7, 2004).  "This is because the assumption of risk defense still helps and serves to define the standard of care under which a defendant's duty is defined and circumscribed." Id. at *2–3 (quotation omitted).

Opposing defendants argue that even if plaintiff had sued the Board in the Underlying Action, the Board would have prevailed by arguing that plaintiff assumed the risk of injury from playing basketball in the Gym.

By engaging in a sport, "a participant consents to those commonly appreciated risks which are inherent in and arise out of the nature of the sport generally and flow from such participation." Morgan, 685 N.E.2d at 207; see also Turcotte, 502 N.E.2d at 968 ("As a general rule, participants properly may be held to have consented, by their participation, to those injury-causing events which are known, apparent or reasonably foreseeable consequences of the

participation.") (citation omitted).  "This includes those risks associated with the construction of the playing surface and any open and obvious condition on it."  <u>Welch v. Bd. of Educ. of City of New York</u>, 707 N.Y.S.2d 506, 507 (N.Y. App. Div. 2d Dep't. 2000); <u>see also</u> <u>Levinson v. Inc. Village of Bayville</u>, 673 N.Y.S.2d 469, 470 (N.Y. App. Div. 2d Dep't 1998) (same); <u>Trevett v. City of Little Falls</u>, 806 N.Y.S.2d 323, 324 (N.Y. App. Div. 4th Dep't 2005) (same) (internal quotation marks and citations omitted).

Determining whether a plaintiff assumed the risk also "includes consideration of the [plaintiff's] knowledge and experience in the activity generally."  <u>Turcotte</u>, 502 N.E.2d at 969; <u>see</u> <u>Joseph v. New York Racing Ass'n, Inc.</u>, 809 N.Y.S.2d 526, 530 (N.Y. App. Div. 2d Dep't 2006) ("[W]hen an experienced athlete . . . is aware of the existence of a particular condition on the premises . . . and actually appreciates or should reasonably appreciate the potential danger it poses, . . . she must be deemed to have assumed the risk of injury which flows therefrom.").

However, a participant "will not be deemed to have assumed the risks of reckless or intentional conduct or concealed or unreasonably increased risks."  <u>Morgan</u>, 685 N.E.2d at 208 (citations omitted).  Therefore, in assessing whether the defendant in a "tort-sports activities" action breached a duty of care, "the applicable standard should include whether the conditions caused by the defendants' negligence are unique and created a dangerous condition over and above the usual dangers that are inherent in the sport."  <u>Id.</u> (internal quotation marks and citations omitted).

"[F]or purposes of determining the extent of the threshold duty of care, [plaintiff's] knowledge plays a role but inherency is the sine qua non."  <u>Id.</u> (citations omitted).

Whether a plaintiff assumed the risk of slipping and falling on a basketball court is a highly fact-specific determination.  <u>Compare</u> <u>Allwood v. CW Post College</u>, 593 N.Y.S.2d 310,

311 (N.Y. App. Div. 2d Dep't 1993) (affirming denial of summary judgment for defendants, finding genuine issue of material fact concerning whether plaintiff assumed risk by playing basketball in indoor gym, where evidence reflected that gym was dimly lit, floor was warped and uneven, and puddles of water had been allowed to accumulate at various locations throughout the gym); with Capello v. Village of Suffern, 648 N.Y.S.2d 699, 700 (N.Y. App. Div. 2d Dep't 1996) (reversing denial of summary judgment for defendant, finding that plaintiff who slipped on basketball court containing "accumulation of a powdery or dusty substance" assumed "obvious risk of injury inherent in playing basketball on a court he knew to be slippery," where plaintiff had played on the court approximately fifteen times over a two-year period and previously encountered the substance on the court, which he knew to be slippery); Levinson, 673 N.Y.S.2d at 470 (reversing denial of summary judgment for defendants, finding that plaintiff who slipped on wet area of basketball court "concededly knew the wet area was there and knew it to be slippery" and therefore "assumed the obvious risk of injury inherent in playing basketball on a court he knew to be slippery"); Collins v. City of New York, 674 N.Y.S.2d 399, 399 (N.Y. App. Div. 2d Dep't 1998) (affirming summary judgment for defendant, finding that plaintiff, who slipped on berries while playing basketball on outdoor court, assumed risks inherent in playing basketball on outdoor court, where plaintiff was "experienced basketball player who had played on the very same basketball court on many prior occasions [and] was fully aware of the berries which fell from overhanging tree branches"); Flores v. City of New York, 699 N.Y.S.2d 345, 346 (N.Y. App. Div. 1st Dep't 1999) (affirming summary judgment for defendant, finding that plaintiff, who slipped on dirt on outdoor basketball court, assumed risks "inherent in playing on the outdoor basketball court . . . , including those associated with the construction of the playing surface and any open and obvious conditions on it," where evidence established that dirt and

18

grime were "a consequence of the naturally occurring condition of the outdoor setting"); <u>Gibbs v. New York City Housing Auth.</u>, 707 N.Y.S.2d 222, 222 (N.Y. App. Div. 2d Dep't 2000) (affirming summary judgment for defendants, finding that plaintiff, who slipped and fell on sand that blew onto outdoor basketball court, assumed risk, where plaintiff was an experienced basketball player, had played on the very same basketball court several hours before the incident, and "was fully aware of the recurring sand problem, which was dealt with by sweeping the court clean at regular intervals").

Moreover, negligence cases, by their very nature, "do not usually lend themselves to summary judgment, since often, even if all parties are in agreement as to the underlying facts, the very question of negligence is itself a question for jury determination."  <u>Ugarriza v. Schmieder</u>, 386 N.E.2d 1324, 1325 (N.Y. 1979).

In this case, the record is undeveloped as to the extent and cause of the Gym floor's slipperiness and whether the floor was mopped appropriately to prevent slipperiness during the Game.  Further, the record contains contradictory testimony from plaintiff concerning whether she knew, before the Game, about problems with the Gym floor.  <u>Compare</u> Pl. EBT at 12–13 <u>with</u> Pl. Decl. ¶ 9.

Therefore, genuine issues of material fact remain concerning (1) the Gym floor's condition; (2) whether the Board owed plaintiff a duty of care and, if so, fulfilled such duty; (3) whether the Gym floor presented an "unreasonably increased risk[]," <u>Morgan</u>, 685 N.E.2d at 208; and (4) if the Gym floor did not present an unreasonably increased risk, whether plaintiff assumed the risk of injury.

19

### ii.     Workers' Compensation Law

NYWCL § 10 requires an employer to compensate its employees for disability "from injury arising out of and in the course of the employment . . . , except that there shall be no liability . . . where the injury was sustained in or caused by voluntary participation in an off-duty athletic activity not constituting part of the employee's work related duties," unless the employer "(a) requires the employee to participate in such activity, (b) compensates the employee for participating in such activity or (c) otherwise sponsors the activity."  An employer "sponsors" the activity if the employer "overt[ly] encourage[s]" the employee to participate in the event. Dorosz v. Green & Seifter, 708 N.E.2d 162, 165 (N.Y. 1999) ("That the employer may have known of the activity, and even acquiesced in it, does not constitute overt encouragement").

Employer liability under NYWCL § 10 is an exclusive remedy.  See NYWCL § 11 ("[Employer] liability . . . prescribed by [NYWCL § 10] shall be exclusive and in place of any other liability whatsoever, . . . at common law or otherwise").

The record reflects that the School did not require plaintiff to participate in the Game.  Pl. Decl. ¶ 6; Pl. Dep. 13:17–19; 20:24–21:3.  Similarly, the record contains no direct evidence that the School compensated plaintiff for participating, or overtly encouraged her to participate, in the Game.

Nevertheless, Opposing Defendants appear to argue that the Board would have prevailed on the affirmative defense that NYWCL bars the Underlying Action because the School's workers' compensation account paid plaintiff's medical bills and must have done so only because the School was "liab[le]" under the NYWCL.  NYWCL § 11; see Opp'n Br. at 11.  In support of this argument, Opposing Defendants annex the Patient History Report, which suggests that the School's workers' compensation account paid McBride & Hurley, M.D., for treating the

injury plaintiff suffered during the Game.  See Patient History Rept.; Pl. EBT at 6; Pl. Dep. 28:2–13.

Plaintiff raises two arguments in response.  First, plaintiff asserts that she never applied for workers' compensation.  See Pl. Dep. 36:22–24; 37:12–13.  The relevant question, however, is whether the Board was liable under NYWCL.  Second, plaintiff argues, correctly, that Opposing Defendants have not presented the Patient History Report in admissible form.  However, Opposing Defendants likely could present the Patient History Report in admissible form at trial.  See Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.") (emphasis added).  Such admissible evidence would raise a genuine issue of material fact concerning whether the School was liable under the NYWCL, such that NYWCL § 11 would bar the Underlying Action.

Opposing Defendants raise genuine issues of material fact regarding whether the Board would have prevailed on two, independent affirmative defenses in the Underlying Action.  Accordingly, while the Court sympathizes that plaintiff received such poor legal representation in the Underlying Action, it must deny plaintiff summary judgment as to the third element of her claim for legal malpractice.

### 4.  Actual Damages

Inasmuch as plaintiff makes the instant motion as to liability only, the Court need not address this element of a legal malpractice claim.

21

**<u>CONCLUSION</u>**

For the foregoing reasons, plaintiff's motion for summary judgment as to defendants' liability for legal malpractice is (1) granted as to the first two elements of the cause of action, namely, that (i) an attorney-client relationship existed between plaintiff and defendants and (ii) defendants were negligent in representing plaintiff, but (2) denied as to the third element of the cause of action, namely, whether defendants' negligence proximately caused plaintiff loss.

SO ORDERED.

Dated:  May 14, 2013
Brooklyn, New York

_____/s/_____
JOAN M. AZRACK
UNITED STATES MAGISTRATE JUDGE
